Your Honor, David Glassman, GLASSMAN. I represent the Attorney General's Office. We are the appellant in this matter. All right. So I understand we had a 28-J submission citing S2 Green, which is a 2011 case, and that the other side has moved to strike that. And we'll rule on that, but the one question I had is, what do you think Green's relevance is, if anything? Your Honor, I can make it simpler. I can make that point without Green. Okay. All right. Then why don't we do that, and we'll strike the submission. Thank you. And speaking of that letter, finally, I noticed that it was filed. I misspelled your name, Judge Berzon. I apologize. I know how to spell your name. Misspelling is nothing, since everybody mispronounces it. It doesn't matter. Hopefully I got that part right. So as the Court knows, and to get right to why we're here, this is a case that starts out, for our purposes, with a State appellate court deciding that the papius corpus petitioner now is entitled to an evidentiary hearing to develop a possibly meritorious Batson claim. And it reverses the conviction conditionally and remands the case to a trial court who conducts the hearing. It's a substantial hearing, in our view, notwithstanding the magistrate's view of it later, and the Court comes to conclusions regarding the reasons stated for the strikes involved and ultimately the Batson challenge. It returns to State court. It is affirmed at that point, following the subsequent review by the State appellate court, and the defendant, now the papius corpus petitioner, proceeds to Federal court. Well, wait, wait, wait. I'm confused. Yes. There wasn't or it was in State court, and then it came here. There was no back and forth between Federal and State court. Correct. Oh, I'm sorry. I thought you said it was in Federal court. No. It was in State court, and then it came back. Okay. So once the habeas, Federal habeas petition is filed, it is addressed by a magistrate. The magistrate writes the report and recommendation. That is the only decision that we are now reviewing in terms of a Federal court judgment. And I want to begin right away, because even with, and I appreciate the extra time, I don't have a lot of time to address the points that we'd like to make. And I would like to reserve five minutes of my 15th for rebuttal, and I am keeping track of my time. I want to focus right on what I think is the first and very problematic aspect of this order. The magistrate says. What's the standard for reviewing the magistrate's order or the district court's order? It is the no-voluntabatsen claim, Your Honor. So, but the, when it comes to the magistrate, we are looking at a variety of standards of review, actually. We are looking at those that the Supreme Court has indicated apply generally in the jury selection context. I'm talking about not only Batson itself, which talks about deference to a trial judge, but Hernandez v. New York and other cases. And then beyond that, we're talking about the ADPA D2 standard regarding factual findings. Now, the magistrate decides, and I will quote the judge. The trial court's failure to engage in comparative juror analysis constitutes a decision contrary to clearly established federal law. That's at page 28 of the report recommendation excerpts, page 49. On the next page, the court says, based on the foregoing, and I'm skipping forward, it's a 2254 D2 violation. So we have what I think is potentially certainly an inconsistency with respect to whether or not the court is finding a D1 violation, which is basically that the state court got the federal law all wrong, or a D2 violation, which is that the development of the facts was unreasonable in light of the record presented in state court. Let me explain why the magistrate respectfully is wrong on either count. Well, on the first count, on the first point, which I don't think is necessarily relevant to the result here, it seems to me that the upshot of our case law seems to be that it's not a 2254 D1 violation as such, but it is more likely to lead to a 2254 D2 violation because if you haven't done the comparative analysis, your result's more likely to be wrong. Not per se wrong, but more likely to be wrong. Well, and that's the whole problem, Judge Berzano. Let me explain why. First of all, it is a much different thing, of course, to say that the absence of the comparative review analysis equates to. All right. So how does that matter to us in the end? I mean, he you think it means that if we're doing a de novo review anyway, why does it matter? Well, I'll tell you why it matters. It matters because we have to first of all look at what review was done in this case in state court. And it is important that the starting off point for the magistrate was there was never a comparative review done in this case. There wasn't. Well, and that is not so clear. And let me turn right to the relevant part of the record. At the outset of the evidentiary hearing, this is now years after the conviction and after the original appellate proceedings when the case has been returned to the trial judge, the trial judge makes the following statement prior to submissions by the parties. I have in excerpts page 461. We are going to the challenged jurors that are subject, that are part of the class. But, you know, I don't think that Mr. Haig, that is defense counsel, is necessarily precluded for making the argument comparing the jurors to the challenged jurors to non-challenged jurors. He is certainly free to make that argument. So you cannot say, as the magistrate indicates, that there has been a failure or a preclusion. You can say that the state judge is telling the defendant's lawyer, and he has counsel at this point, you make the showing that you think establishes the Batson violation or what is referred to in California as the Wheeler violation. And in terms of how elaborate that invitation has to be, and to your point, Judge Berzon, about where the law was, the law was changing in this area as of this time. This is almost a decade ago. And the law at this time, for example, is indicated in Boyd v. Newland, a case that Judge White heard, is that the Ninth Circuit at one point said, we don't allow this comparative review, and now we do, and we will reconsider our original Boyd opinion in light of Miller L., a 2005 Supreme Court case. But at any rate, my point is that invitation is offered to the Petitioner. And at that point, there is some indication at some points in the record of some attempt to make some indication of jurors as to race. And the reason that that's important is that the only relevant consideration in comparative review is what happened to stricken, in this context, African-American jurors versus stricken non-African-American jurors. And why is that? Because, Your Honor, the cases say that. Miller L. says that. Cook v. Lamarck says that. The discrimination claim is that you excluded an African-American juror for the same reasons that did not lead you to exclude a non-African-American juror. But ultimately, this is about pretext. And if you are giving reasons that are not, in fact, governing the way you're behaving with regard to any of the jurors or other jurors in general, that suggests that that wasn't really your reason. And why does it matter whether it's an African-American juror or isn't an African-American  It matters for two reasons. First of all, it matters because the ultimate injury here is viewed as racial discrimination. Right. So if your point is, well, you can't lie in jury selection either. I'm not acknowledging that he can, did, or should. But what I'm saying is that the cases say. I have a situation here where he, they struck one African-American juror after another. The total was, I don't know, how many, nine or something? Eight or nine. Eight or nine. Okay. And then they were asked to give reasons. If the reasons were not, in fact, used with respect to any other jurors, whoever they were, since we're starting with a situation where there's a prima facie case, if they can't come up with reasons, it doesn't matter who they were not coming up with them for. Well, respectfully, Judge Berzon, I think it does matter. If, for example. Well, let's take a Title VII case, okay, like a McDonnell-Douglas-type case, which has a similar structure, right? The race-based part of it goes in essentially at the first stage, right? And there's an inference to be drawn. So here there was an inference to be drawn. Then they have to come up with race-neutral reasons, right? If, in fact, then there's an opportunity to show that that race-neutral reason that was given wasn't the reason. Right? It really wasn't the reason. So you're negating. It's going away. And what you're left with is the original inference. Go ahead. Here's the problem. The problems are manifold, manifest rather, and I'm racing toward my rebuttal time. The problem is, number one, the whole basis for the pretext finding would be you said X as to a non-African American, but the same consideration applied to another juror. If the ‑‑ with the starting assumption of the magistrate is that the distinction is ‑‑ I thought it was just you're lying. We already have an inference, and you have to come up with a race-neutral reason to overcome that inference. And the one you gave is you're lying. Well, under the ‑‑ what I submit is clearly is to have this Federal law, it is as between in this context African Americans and non-African Americans. Second of all, to your point that you're lying. If ‑‑ because I think it's also clear that this magistrate is of the view that the comparison that the magistrate purports to make is of jurors of different races, even though the record does not allow that comparison. And it doesn't allow it because the petitioner didn't develop it. And that is why D2 doesn't apply. It is the standard for D2 ‑‑ Was that the reason or was there a reason that there was such a truncated proceeding at the beginning as the California Court of Appeals said when it rebounded for a hearing years later that at the original stage it could have been established, but it couldn't have been established by the point of the hearing? Well, the difficulty with that is that you have a more expansive hearing at the evidence you're hearing. You have time to prepare for a hearing. You have a 65‑page record. Well, you have all of that, but you have no way to manufacture the race of the people when they're not sitting there anymore. And that's only relevant if, unlike in the cases that you heard, the in‑bank case, I think it's Kessler, unlike in Miller L., where there's no dispute as to the adequacy or the ability to reconstruct that information. The petitioner's lawyer never says, I'm handicapped in this regard, I'm prejudiced, I can't document this. He makes the arguments that he thought were relevant for the Batson claim. And they did not involve a significant comparative review that included relevant information about other jurors. So when you have such an incomplete record and a fact finder, I understand that trial judges are not entitled to absolute deference, but the cases are clear that they are in the primary position. This magistrate reads a transcript, has none of this information. The trial judge says at page 65, I'm not, I don't have information about faces, about identification, about information. So to that extent that an evidentiary record could have been produced, it wasn't. And their D2 never comes into effect. And that is why the starting point in this case, in which the magistrate says from there, there will be no deference, and I will conduct a review, notwithstanding the fact that I have this completely truncated transcript of a hearing, and that's all I have to evaluate the credibility of people who are not before me. Do you want to save your time? Yes. Thank you. We could always expand my time, but I'll... We're rather late in the day. I know. I'm sorry. I appreciate it. Just an idea. Thank you. I do think we understand what you're saying. I mean, it's problematic in the sense that everything, if the trial court had conducted the right analysis in the beginning, we wouldn't be here. So... I'll speak to that as well. Thank you. All right. Your Honor. Good afternoon, I guess, at this point. Your Honor, may it please the Court. I'm Peter Gold for Mr. McGee. I guess I will try to be brief, and I'll respond to what my colleague has argued. His basic argument, as I understand it, is that we shouldn't be – that the magistrate judge should not have started from scratch with regard to the record, given the defects in the record, which were the fault, essentially, of the Petitioner, who could have done it otherwise. Right. That's the short version.  I think what happened is, first of all, you can't ignore the judge in this case. This is a judge who said he couldn't possibly imagine a prosecutor who could strike jurors for racial reasons. And in his preparation for this hearing on remand, he did nothing to prepare. He didn't even look at it. He didn't have notes. He wouldn't go back and look at the voir dire as it was, thinking that it just wasn't relevant to him. So to the extent that any court would give that judge deference to begin with, he doesn't deserve it. The second thing that I think is important is, to the extent – I think that it should be noted, at least in his motion on remand, defense counsel did urge comparative analysis. I don't believe that the judge – I don't know. I'd have to look at the page references that counsel is referring to. But I can't imagine that that judge was engaging in any comparative analysis himself, regardless of the fact that this was put before him in the motion, and that's in the supplemental excerpt of record. What is the significance of the fact, if any, that the jury is ultimately constituted, included five African-American jurors? What is the significance? It's a factor that has been taken into account by some courts to show a nondiscriminatory intent. But in a case like this, where you have nine out of 11 of the prosecutor's strikes having been for African-Americans, and four Batson motions made already, it's not surprising that the prosecutor is going to be a little shy, perhaps, about keeping them. So it's a factor that courts have taken into consideration, but I think given all the other evidence of a discriminatory intent, it's a relatively weak situation. Do we know whether there were African-Americans sitting in the jury box at the time of the last of the Batson motions? Other ones who weren't struck? I think that – We don't have a very good record on who was there. My record isn't great, and I tried to parse out what I could as far as which jurors we knew at which point in time. So there were some jurors we knew that were not African-Americans that we could look at. But for the most part, we don't. But we couldn't necessarily say from this record that the people who were retained were essentially all retained after the last of the Batson motions. In other words, what I'm saying is nine out of 11 African-Americans were struck. There were a series of Batson motions. Did the striking stop at that point, or were there people who had already – were there African-Americans who were already sitting there who hadn't been struck when they could have been earlier? I'm not sure I can tell that. I'm not sure I can tell that. Okay. And we don't know what the percentage of African-Americans in the overall panel was, do we? I don't know that that record was made either. I don't think so. Because it wouldn't make a difference if 90 percent of the prospective jurors were black and – Right. Or if 10 percent were, wouldn't it? Yeah, and I think that point probably would have been asserted by somebody in saying, look, everyone here is African-American. I mean, if you're striking people, it wouldn't make – you couldn't make the motion if everybody was African-American. So, yes, I think that probably somebody would have brought that up if the numbers were as, you know, anything but. You should have brought it up. I think that defense counsel brings it up by making the motion he made out of time to finish the case. And then at that point, I'm not sure that the numbers are as significant as the prosecutor's reasons and for purposes of determining the pretext from the prosecutor's reasons. Where was this trial held? Do you know what court, what judge? Was it Englewood? Boy, I don't know offhand. This was a long time ago. I thought it was Englewood. Carson? If Your Honor knows, then I would – I'm not – I can't tell from the records. I haven't any right now. I don't have the states. I don't have the – Okay. Okay. All right. Another point I want to make is, although my counsel is referring to the trial court, the court of appeal made clear in their opinion that the rule is clear in this State that in evaluating the sufficiency of the prosecutor's explanations, a reviewing court will not engage in comparative analysis. And so regardless – and again, I think it's ridiculous to suggest that the trial court engaged in any sort of comparative analysis in ruling in this case, but it's clear that the court of appeal didn't, and that's the last reason decision that this Court is to look at. Now, are you claiming that that is a 2254-G1 violation, or in light of Cook, you're simply claiming that it just undermines the factual finding? I do. I think it's the latter. The only thing I'll say is that – which I think the district court said as well, if you're looking at D1, the court of appeal seemed to lump the second and third Batson steps together by saying – by focusing only on the prosecutors using or coming forth with race-neutral reasons. And so I don't know if that's what the district court was focusing on to the extent that it was suggesting that there was a D1 violation, but – But your view is we don't need to go there. We just need to look at – Correct. I don't believe – I don't believe you need to go there. I believe I've covered the points, unless Your Honors have any other questions. So, but, I mean, given the fact that there is a lot of language in the cases, and good common sense as well, that the trial court is entitled to a lot of deference on what is ultimately a fact-finding about what the prosecutor's motive was. Your – and then we have the double-deference problem of AEDPA as well. What is your ultimate reason why we should not be respecting the trial court's views? Well, Your Honor, I think that – And also, are we – does the – are we reviewing the magistrate judge's findings here as clear errors so that we have a sort of obverse deference, or are we doing a de novo? I think it's – well, I mean, I think it's a de novo review, and it is a little complicated with the different standards. But all the reasons that I have are the reasons that are so fact-intensive that have been set forth here, but the prosecutor came up with – so many of the reasons that the prosecutor gave were either unsupported in the record or unrelated to this case or, doing the comparative analysis, were flatly contradicted by what the prosecutor did with other jurors. The trial court here, whether he tried to or not, but I don't believe the trial court did any attempt – I don't believe the trial court did any attempt to or did not try to find those pretexts that show up in the record. And they're all over, and that – and I think that the – And then more specifically, the magistrate judge ultimately found that there was race-based reasons with regard to two of the jurors and kind of muttered a lot about the rest but didn't find that there was. So is that what we should do, or should we go through the two? I think that the Supreme Court cases have done the same thing, that they have – I know that they – all you need to do is find one juror that has been stricken for improper reasons. So which is the strongest juror? You don't need to go through – Which are the strongest ones? Who should we be looking at if we want to make our lives easier? Well, if you want to make your lives easier, I would go with it's nine – it's the second one because the reasons are fewer. But it's 9744. But juror 4046, the prosecutor, gives so many reasons that are so unfounded and contradicted by everything else that there's a lot to say there, which the district court did. But I understand why the district court also, as you say, muddled through there. Even if you got rid of those, there's lots of other evidence of pretext in this record, which I believe I included in the opening brief, which the district court highlights as well, which you could rely on if you found those other jurors. But it's another way of looking, though. I mean, it's one version of what went on here, that the prosecutor began by applying sort of his normal standards of – of a jury pool or postal workers or whatever. And after a while, it became clear that there was no way to sustain this. There wouldn't be a jury if he did this in this instance because everybody seemed to have them, every race. And so eventually he stopped doing it. But that – it wasn't really that he was being pretextual. It's that the usual reasons applied to this particular jury pool seemed to not leave a jury. I understand Your Honor's point. And first of all, I would have to go back and see which jurors those apply to in the striking process. But regardless of that, the prosecutor makes statements after – two years after the fact and at that hearing, but more so after the fact, that are just belied by what he did on the record. So if he says that – So if he had stood up a bit more honest and said, you know, look, I was – you know, I have certain principles I usually apply. I was applying them. And after a while, it became clear I wasn't going to have a jury. So I stopped applying them. Right. Right. I mean, right. If he's honest and he's got an honest explanation that makes sense, okay. But not so here. Not so here. Thank you, Your Honor. Doesn't it really make a difference on how you look at this as to the number of – the percentage of black jurors or African-American jurors among the pool? I mean, it looks a lot worse if 25 percent of the prospective jurors are African-American than it does if 90 percent of the prospective jurors are African-American. Well, Your Honor, again, I think that that – although I think that the numbers certainly can go to showing a discriminatory intent, I think that the numbers are more powerful for purposes of a prima facie case. And I think once you have established a prima facie case and the trial court has asked for reasons, then you're looking at what are his reasons for striking this juror or that juror. And if, as in this case, the prosecutor is coming up with reasons that are just unfounded or, you know, belied by what he's done with other jurors, then at that point you can say that he – that these are not – his motives are improper. What was the comparison at the point in time at which the strikes were made or was it the whole jury as it was ultimately seated? The – The ones that were used – that you've been using in – Yeah. I think it's – I think it's – The seated jurors. Yeah. So in terms of this temporal difference, it wouldn't show up, if there were a temporal difference. You could see when he – oh, I see what you're saying. Yes. The only thing I could say about that is that there are occasions – there have been some occasions here where the defense attorney – I'm sorry, where the prosecutor accepted the jury with certain jurors on there. Maybe the defense attorney struck that juror and we used that once or twice, I think. But I – you're right. Okay. That might be difficult to – All right. All right. Thank you, counsel. Thank you, Your Honor. The numbers are only meaningful if you know what the numbers mean. So we don't know what the veneer is because that information was never developed. We do know that not merely five African-Americans served on the jury, but that at least five. And, obviously, I think at some point it's – while it's relevant, the Supreme Court says it's relevant, you know, these factors are a little distasteful, frankly, to try to conjure up. We know the case is tried in Carson – or rather in Compton. Compton. I'm not going to speculate further about factors like that because, as I said, that's why we should have records where – It's LA County Superior Court in Compton. And there is none in Carson. I think the court is thinking – I'm sorry. The jury is pulled from LA County or more locally. The jury is pulled from the counties surrounding Compton. So, for example, if a high degree of Carson – 20 miles or so, right? Sorry? That's about 20 miles? Yes. If a high number of jurors reside in Carson, that is because of Carson's proximity to Compton and there is no Superior Court. I'll add in a few numbers before I finish. The ones that I – and I'm only adding these numbers because courts say they're relevant. This is a case where the victim is African American. Now, you made a – I mean, you seem to be arguing in your brief that Batson just doesn't apply. I hope you're off that. Well, no, that's not my argument. My argument is exactly the opposite. It does apply. It applies – and much of what's in Batson is directly relevant here. I'm almost out of time. The hearing that was conducted was not an abbreviated hearing. It was a 65-page session. There was a dialogue with the Court throughout – The first one or the second one? I'm sorry? The first time or the second time? There's only one evidentiary case. All right. The one that was two years later. That's right. Not the first one. And, again, as to the – what should have been done the first time, Judge Ward, I can only reiterate that there was certainly at a minimum disagreement, as Boyd v. Newland indicates, about what was an adequate hearing. I would submit this is an adequate hearing today, just as it was in 2003. But since I'm out of time, the last thing that I'll point out to the Court, because we are looking at these statements, is the so-called – what the juror, if we're talking about – you know, I'm not camouflaging what I think is really a racist prosecutor who is hiding behind the buzzwords of peremptory challenges. 4640 is the juror that the magistrate says, that's the smoking gun, that's the first juror that I'll discuss before I'll discuss 9744. Very quickly, 4640, the prosecutor says, she is apparently in her 70s. She is an employee of the school district. And her response regarding prior jury service is, I have never served jury duty. The prosecutor says, that is a red flag in my mind. If you asked me whether I'd served jury duty, I'd say no, but I've been called to jury for years. I've been called many times. They never let me on. And I submit that whether or not her statement can be perceived as ambiguous, it is not ambiguous on its face. I have never served jury duty. I'm sorry, why not? Because it's an absolute statement. Why is that disqualifying for serving jury duty, though? It's only disqualifying to the extent that it is because of, and by the way, it's not the only reason. I know, I know, we've read all this. Okay. But it is disqualifying if someone has made a good faith evaluation that in a peremptory challenge, that is a red flag in their mind.  It is on its face. Well, here she was. She showed up now, right? Yes. So what's the red flag of? The red flag is that someone who has worked for a public entity. Meaning what? She was evading jury duty? What's the significance in our understanding? That she had no experience as a juror, that that seemed, it's no more or less rational than the many bases for peremptory challenges that are viewed as acceptable. But lots of the other people had no experience as jurors. I thought you were saying something about her age and the fact that she worked for a public entity and the fact that she hadn't somehow implied that she was evading jury duty. But the fact that she hadn't served in a jury couldn't be it. Well, it can be something that is considered. The only juror that she is compared to, according to the magistrate, is? So nobody who ever served in a jury can serve in a jury? Well, that's not, first of all, if that is his sincere benchmark or barometer, and I'm not saying that it is. But it isn't. But he was striking people without jury service, yes. That was in his mind a disqualifying factor. Could it be overcome by other considerations with respect to the personality or background of that juror? Yes. That was a factor in her case that was significant to him. The magistrate says, well, you didn't remove the retired truck driver, right? We don't know the race of the truck driver, and it appears to me, if you follow the dots on this four dire in the transcript at this point, which is not the easiest thing to do, the truck driver was struck. He was struck by the defense prior to jury enpanelment. So, lastly, this jury was accepted three times before the first Batson motion was made. The prosecutor says, repeatedly, the jury changed. I was looking at people in combination with other people. That's what preemptory challenges were, better or worse. But it was accepted by who? By the prosecutor. Three times. Three times. And then the defense. Made the first Batson motion. So what would be a better indication of his willingness to accept jurors? I don't understand what that means, unless these people were on the jury at the time he accepted it. I think, at a minimum, 4046 is on the jury at that point. Yes. And the last thing, just because I think this would be helpful down the road, is if there is a deference standard, whatever it is, regarding D1, there has to be some indication by the court. You know, if we're going to say that now we are expecting or requiring this comparative review to be done, and, again, the courts don't say that. They allow that federal courts may do it. They don't impose it as a requirement of due process on state courts. They haven't. There is no case that holds that. Right, right. So what's the point? So my point is, then, if we're saying we're going to presumptively view any case that lacks the comparative review component as inferior, that D1 is gone in every case. All right. Thank you, counsel. Thank you. Appreciate it. This court is adjourned for today. Thank you for a good argument, both of you.
judges: Whyte, Wardlaw, Berzon